**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| LAWRENCE HARTMAN, JR.,        ) | |
|              ) | |
|        **Plaintiff,**      ) | |
|              ) | |
|   **v.**              ) | **2:02cv1038** |
|              ) | |
| MOTORISTS' MUTUAL INSURANCE    ) | |
| COMPANY,             ) | |
|              ) | |
|        **Defendant.**      ) | |

## MEMORANDUM OPINION AND ORDER OF COURT

### Introduction

In June of 2002, Plaintiff Lawrence Hartman, Jr. ("Hartman" or "Plaintiff") filed this insurance action against defendant Motorists' Mutual Insurance Company ("Motorists'" or "Defendant") in the Court of Common Pleas of Allegheny County. The gravamen of the case is that Defendant failed to pay for the damage caused to Plaintiff's new building when a ceiling-mounted oil furnace leaked approximately five (5) gallons of home heating oil into the building. Defendant contends that the loss is not covered under the terms of Plaintiff's insurance policy.

Defendant removed the case to the United States District Court for the Western District of Pennsylvania. The case was initially assigned to the Honorable Robert J. Cindrich, and was re-assigned to the undersigned on October 10, 2002. The case was then referred to United States Magistrate Judge Amy R. Hay, who allowed Plaintiff to file a Second Amended Complaint. *See* Document No. 31. The Second Amended Complaint states claims under Pennsylvania law for breach of contract and bad faith under 42 Pa.C.S. § 8371. Magistrate Judge Hay subsequently issued a Report and Recommendation which recommended that the Court deny the Motion for Summary Judgment filed by Defendant. Document No. 41. Defendant's objections thereto were overruled, and the Report and Recommendation was adopted as the opinion of the Court. The case was then referred back to the undersigned for trial. A non-jury trial commenced on February 22, 2005 and concluded the next day. A transcript of the proceedings was ordered, and the Court afforded the parties an opportunity to submit post-trial proposed findings of fact and

conclusions of law. Hartman has filed his PROPOSED FINDINGS OF FACT, ARGUMENT AND CONCLUSIONS OF LAW (*Document No. 77*). Defendant has filed DEFENDANT'S POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW (*Document No. 78*), as well as DEFENDANT'S POST-TRIAL BRIEF (*Document No. 79*). The issues have been fully briefed, and the matter is ripe for disposition. Accordingly, the Court enters the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). For the reasons that follow, the Court finds in favor of Plaintiff on the claim of breach of contract, but finds in favor of Defendant on the claim of bad faith.

## Findings of Fact

1. Plaintiff is the owner and operator of a business located at 5316 National Pike, Markleysburg, Pennsylvania 15459. Plaintiff's business includes the sale of all-terrain vehicles, outdoor equipment, gasoline and other products. Joint Stipulation, ¶ 1.

2. Defendant is an insurance company with offices and a principal place of business in Columbus, Ohio. Defendant is licensed to conduct business in Pennsylvania and maintains a claims office at 2674 Monroeville Boulevard in Monroeville, Pennsylvania. *Id*. at ¶ 2.

3. On or about June 10, 1999, Plaintiff purchased a Motorists' Mutual business insurance policy (the "Policy") from Lee-Weaver Insurance Agency, located in Washington, Pennsylvania. *Id*. at ¶ 3. The Policy provided property, inland marine general liability, auto, garage umbrella coverage and workers' compensation insurance for Plaintiff's business operations, as well as coverage for personal property, loss of use and personal liability. For property damage, the policy included replacement cost coverage subject to the terms, conditions and limitations of the policy. *Id*. at ¶ 5.

4. Plaintiff dealt exclusively with David Weaver ("Weaver") of the Lee-Weaver Insurance Agency, who was responsible for placing the coverage with Motorists'. *Id*. at ¶ 3. When Plaintiff inquired into purchasing the policy, Weaver described Motorists' as a "strong, stable company," and gave Plaintiff the names of clients that Weaver represented who also had insurance with Motorists'. *Id*. at ¶ 4.

2

5.      Weaver is an insurance agent and has been an insurance agent since 1986.  As an insurance agent he had a business relationship with Motorists' where he was an independent agent who represented and sold insurance products for Motorists'.  He represented Motorists' and its products to the general public and was an authorized representative of Motorists' during the relevant time period.  He was authorized to sign documents as an authorized representative of the company.[1]  His agent number for Motorists' Mutual is 8342, and he was authorized by Motorists' to accept premium payments from various clients on behalf of Motorists'.  Transcript ("T") at 69 - 70.

6.      When Plaintiff visited Weaver's office, there was a 4' by 4' sign outside of the office that said "Motorists Mutual Insurance Company" and had the Motorists' Mutual logo on it. T. at 19 - 20.  Many of the policies that Weaver wrote were endorsed with not only Motorists' logo, but also the Lee-Weaver or David Weaver Insurance logo.  Motorists' would pre-print the forms that would have both Defendant's logo and Weaver's agency logo on them.  T at 73.[2]

7.      Plaintiff believed that Weaver was an agent who worked for Motorists', and sold and took care of their insurance.  Weaver had never offered Plaintiff a business policy from any company other than Motorists'.  T at 19.

8.      Weaver was authorized by Motorists' to make representations to his clients about what coverage he is selling them.  He was authorized by Motorists' to say what's in the policy and to respond to Plaintiff's inquiry about what he needed for his business, his construction, and the like.  T at 83 - 84.  Plaintiff relied upon Weaver's advice in purchasing the policy and dealing with issues that arose during the construction of his business.  T at 84.

9.      Exhibit 1 is the Policy written for Plaintiff.  Defendant's logo was endorsed on

---

[1]  However, Weaver had no authority to re-write a policy or to waive policy exclusions.  T at 88-89.  Similarly, Weaver was not authorized to compromise claims, but would negotiate with Motorists' claims department on behalf of an insured.  T at 87.

[2]  Plaintiff also obtained homeowners' insurance from Motorists'.  That policy identified Weaver on the face sheet as an "authorized representative."  His agent number from Motorists' was endorsed in the bottom right-hand corner of the policy.  T at 21; Exhibit 1.

the Policy, as was the name "Donald R. Weaver Insurance Inc." T at 71. The policy was signed by Weaver as an authorized representative of Motorists', and Motorists' logo was endorsed on the signature page. T at 74.

10.    Prior to the year 2000 Plaintiff's business consisted of a small gas station, a sports shop and a mechanical bay of approximately 30' by 60'. T. at 10. In the year 2000 Plaintiff decided to tear the old building down and reinstall a new building. The new building was 60' by 80'. T at 11. During construction Plaintiff conducted business in a teepee-like device made out of a tarp. A contractor constructed the main part of the building, the electrical and the heating systems, but Plaintiff personally handled the remainder of the construction. T at 12.

11.    The roof and attic of the new building were supported by free spanning wooden trusses approximately 80' in length. Attached to and below the trusses was a corrugated steel ceiling. Above the ceiling were 1 ½" Styrofoam Dow boards, followed by a layer of clear plastic and blown-in insulation. T at 14. The building was heated by an oil-fired furnace which sat on a platform on top of the lower span of the trusses. T at 14.

12.    Plaintiff had Weaver come to his premises and review the construction with him on several occasions. On at least two or three occasions when Weaver visited the premises, and prior to the leak in the furnace, he was shown through the building. T at 23-24. Plaintiff discussed the business coverage for the building with him both on the phone and in person. Numerous construction questions were posed to Weaver during these conversations. T at 23-24.

13.    Plaintiff discussed the type of furnace with Weaver on several occasions during the construction of his building. He showed Weaver where the furnace was going to be, where the ducts were going to run and how the system would operate. Plaintiff asked Weaver whether a problem with the furnace would be covered, and if not, what he needed to do to make sure it was covered. Weaver advised Plaintiff that the furnace was covered by his insurance policy.[3] T at

---

[3] Weaver recalls having discussions with Plaintiff on a number of different occasions regarding what coverages he would need for his new building and/or for the renovation of his building. He recalled Plaintiff discussing the furnace that was going into the ceiling of the building and asking questions about the coverage with respect to that furnace. T at 75-76.

4

25-26.

14.     Plaintiff specifically inquired about the possibility of a leak in the oil furnace due to the fact that his parents had a similar problem 10 to 14 years earlier.  His parents' furnace was also in the attic.  Weaver advised Plaintiff that if such a problem occurred at his premises it would be covered by the Policy.  T at 26-27.

15.     On April 3, 2001, shortly after the construction and furnishing of the building was completed, Plaintiff suffered a loss when a seal on his oil furnace failed.[4]  As a result of the malfunctioning seal, the pump that supplied oil to the furnace activated and pumped approximately five gallons of heating oil into the attic of the building.  Joint Stipulation at ¶ 7.

16.     When the seal failed, the oil was pumped through the furnace.  The oil then came out of the furnace, soaked the insulation, melted the plastic and the Dow board, contacted the metal ceiling, ran out the seam of the ceiling and dripped into the retail area of the building.  T at 32.

17.     At the time of the leak the carpet was four or five days old.  The carpet was damaged by the leak.  Additionally, the roof and ceiling, including the trusses, were impacted by oil.  T at 33-34.

18.     Plaintiff made a claim to Motorists' through Weaver.  Motorists' received notice of the loss on or about April 6, 2001, and assigned the claim to Gary Weber ("Weber"), a claims specialist in Defendant's Monroeville, Pennsylvania office.  Joint Stipulation at ¶ 8.  Weber visited the site on April 11, 2001.  *Id*. at ¶ 9.

19.     Weber then reviewed the circumstances of the loss with Jim Evans ("Evans"), Ed

---

Besides Weaver, no one affiliated with Defendant made any representations to Plaintiff regarding what was or was not covered by the policy.  T. at 77-78.  Weaver's testimony was generally consistent with Plaintiff's testimony.

[4]  The Policy was in effect at the time.  It was renewed for a one-year term on June 10, 2000, and thereafter at one-year intervals.  Plaintiff's business is still insured by Motorists.  Joint Stipulation, ¶ 6.  Plaintiff was never told that Weaver was a broker as opposed to an agent for Motorists'.  T at 23.

Wetzel ("Wetzel") and Judy Palamara ("Palamara") of the Monroeville office.[5]  *Id*. at ¶ 10.

20.    On April 12, 2001, Evans discussed the claim with Courtney Taylor ("Taylor"),[6] a claims consultant in Defendant's home office in Columbus, Ohio.  Joint Stipulation at ¶ 11.  During this conversation, Evans and Taylor both agreed that the "pollution exclusion" applied to the loss.  T at 137.  Evans then instructed Weber to deny the claim based on the "pollution exclusion."  T at 138.

21.    The Policy contains the following exclusion of coverage for property damage caused by or resulting from pollutants:

> We will not pay for loss or damage caused directly or indirectly by any of the following.  Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.
>
> ***
>
> Discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss."  But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified causes of loss," we will pay for the loss or damage caused by that "specified cause of loss."

Joint Stipulation at ¶ 24.[7]

22.    The Policy defines the term "pollutants" as follows:

> "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled, reconditioned or reclaimed.

---

[5]  At the time of the loss, claims adjuster Weber reported to claims supervisor Evans.  At that time both had approximately 25 years of claims experience.  T at 134, 153 & 186.

[6]  Taylor's role as a claims consultant is to assist Motorists' branch offices in determining coverage on property claims.  Joint Stipulation at ¶ 11.  At the time of the loss, he had roughly 35 years of property claims experience, and was the most experienced person in the company with respect to property claims.  T at 118.

[7]  The loss incurred by Plaintiff did not fall within one of the "specified causes of loss" under the policy.  Joint Stipulation at ¶ 26.  "Specified causes of loss" are defined as follows:
> Fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

*Id*.

*Id*. at ¶ 25.

23.     The Policy also includes an Additional Coverage Extension, which provides as follows:

**Water Damage, Other Liquids, Powder or Molten Material Damage**.  If loss or damage caused by or resulting from covered water or other liquid, powder or molten material damage loss occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes.

*Id*. at ¶ 27.

24.     Evans e-mailed and spoke to Taylor again on April 24, 2001.  At this time, Taylor suggested that Motorists' could offer to pay for the damage to the carpet, but that any demand for damage to flooring would be subject to the Policy's "pollution exclusion."  *Id*. at ¶ 12.

25.     By letter dated May 16, 2001, Weber wrote to Plaintiff's public adjuster, Walt Renner, to confirm Defendant's position that the loss was subject to the pollution exclusion. Weber indicated, however, that Motorists' was willing to pay for the section of carpet and tile that had been damaged by the oil.  *Id*. at ¶ 13.  Motorists offered to pay for the damage to the carpet and tile as a concession to Plaintiff, and as an attempt to resolve the claim.  However, Evans still regarded it as a pollution loss.  T at 159.  Plaintiff was understandably dissatisfied with this offer and rejected it.

26.     On or about August 23, 2001, Motorists "boarded" the claim.  Joint Stipulation at ¶ 15.  A "Board" is a meeting attended by the claims representative (*i.e.*, Weber), two supervisors and a branch manager at which the claim is discussed.  Palamara was the branch manager; the supervisors involved in the discussion were Wetzel and Evans.  The Board concluded that the denial of coverage was proper, but decided to retain an expert to prepare an estimate of the cost of repairing the damage to the building.  T at 160-63.

27.     On or about September 19, 2001, upon Defendant's request, Dan Jones ("Jones") of G.S. Jones & Sons visited the property for the purpose of preparing an estimate of the cost of

repair.  Joint Stipulation at ¶ 16.[8]  Jones provided a written estimate to Weber in the amount of

$39,669.85 to repair the building.  *Id*. at ¶ 17.

28.     After obtaining the G.S. Jones & Sons estimate, Defendant "boarded" the claim a

second time on September 24, 2001.  *Id*. at ¶ 18.  The Board again concluded that the denial of

coverage was proper.

29.     On October 17, 2001, Defendant again offered to reimburse Plaintiff for damage

to the carpeting and floor tile, but denied coverage for the remainder of the loss, based on the

pollution exclusion.  *Id*. at ¶ 19.  52.

30.     By letter dated February 11, 2002, Weber again advised Plaintiff that Defendant

was willing to settle the claim for the cost of replacing damaged carpet and one damaged tile,

which amounted to $19,383.90.  Weber reiterated Defendant's position that the entire loss was

excluded from coverage under the pollution exclusion.  *Id*. at ¶ 20.

31.     On or about March 15, 2002, Weaver forwarded to Weber a letter from Attorney

Ging.  In his cover letter, Weaver wrote that he felt Defendant should pay the claim, minus

service fees for the furnace, and subrogate the claim against National Grange, the insurance

carrier for the heating contractor.  Joint Stipulation at ¶ 21.  Weaver believed that there was

coverage for the leak in Hartman's furnace contained in the insurance policy due to the fact that it

was a select property or special form for property, which is an all risk policy minus exclusions in

the policy wording.  Weaver was unaware of any exclusions for the type of damage which

Plaintiff sustained.  T.82 - 83.

32.     In response to the letters, Motorists' branch office "boarded" the claim a third

time.  The Board again concluded that the denial of coverage was proper.  Joint Stipulation at ¶

22.

33.     On March 26, 2002, Weber wrote to Attorney Ging.  Weber again offered to settle

the claim for $19,383.90.  Plaintiff again declined the offer of settlement.  Plaintiff unreasonably

---

[8]  G.S. Jones & Sons is a construction company that specializes in the restoration of
damaged structures.  T Vol. 2 at 27.

wanted Defendant to pay to replace *everything* in the building that was touched by oil, including the wooden roof trusses and metal ceiling panels, regardless of the cost and regardless of whether the replacement of said items was really necessary.  He obtained his own estimates to restore the building to its condition prior to the leak.  T at 39-40.

34.     Estimates for various repair and restoration services were provided by Steven Humbert, Carmen Polito, Don Farr Moving and Storage, Disaster Specialists, G.S. Jones & Sons and B.J. Contractor.

35.     On or about April 21, 2001, Plaintiff contacted BJ Contractor of Markleysburg, PA and obtained an estimate in the amount of $62,751.37.  See Estimate dated April 12, 2001.  T at 53.  The B.J. Contractor estimate was based on cleaning and replacing the original metal ceiling panels.  T at 55.

36.     On or about July 17, 2001, Plaintiff, through Attorney Ging, provided his own estimates of the cost of restoring the property.  Plaintiff's estimates, summarized in a letter prepared by Attorney Ging, included the following:

- $17,568.00 for removal, storage and return of the building's contents;

- $1,550.11 for damage to clothing in inventory;

- $62,469.31 for repairs to the roof and ceiling, including replacement of seventeen 80-foot roof trusses and 4,400 square feet of steel roof sheeting;

- $46,210.00 for general repairs to the interior of the structure; and

- $10,993.94 for new carpeting.

Joint Stipulation at ¶ 14.

37.     Hartman's estimate for damaged clothing in the amount of $1550.11 was based on retail selling price rather than what it would have cost Hartman to replace the clothing.  Hartman did not know what it would have cost him to replace the clothing.  T at 50.  However, the Court will estimate a retail markup of 40%, which results in Hartman's loss being approximately $930.00 for the damaged clothing.

38.     It was not necessary to replace the entire roof and ceiling in order to restore the

building to its pre-loss condition.  The roof trusses were not structurally damaged and those that came in contact with the oil could be cleaned and sealed with a commercially available primer/sealer.  The ceiling panels in the affected areas could be taken down and cleaned, and the insulation in the affected areas could be replaced.  Thus, the estimate for $62,469.31 to replace the trusses, the roof and the like is simply not reflective of Plaintiff's reasonable damages.

39.     The estimate of $46,210.00 provided by Disaster Specialists most accurately reflects the loss suffered by Plaintiff.  The Court finds that the repairs proposed by this estimate would thoroughly repair the damage to the building without "cutting corners" or otherwise failing to properly repair the damage.[9]

40.     The proper repair of Plaintiff's building would also require the expenditure of $17,568.00 for removal, storage and return of the building's contents.  *See* South Hills Movers' estimate of 5/29/01.  A photograph of the interior of the store reflects that it would be extremely impractical, if not impossible, to shuffle the inventory of the store from one side to the other while the carpet was being replaced.  *See* T. at 44-45.  The removal, storage and return of the building's contents is also necessary to facilitate the repair of the ceiling.  The inventory of the store is spaced tightly and must be removed to allow for the unfettered use of scaffolding and/or ladders.

## Conclusions of law

1.     The court has jurisdiction under 28 U.S.C. §1332, in that the parties are citizens of different states and the amount in controversy, exclusive of interest and cost, exceeds $75,000.00.

2.     A federal court sitting in diversity must apply the substantive law as decided by the state's highest court.  *Travelers Indem. Co. of Illinois v. DiBartolo*, 131 F.3d 343, 348 (3d Cir. 1997) (citation omitted).  When the Pennsylvania Supreme Court has not directly addressed the issue before the Court, the Court must predict how the Pennsylvania Supreme Court would resolve the issue.  *DiBartolo*, 131 F.3d at 348 (citation omitted).  Carefully considered *dicta* from the Pennsylvania Supreme Court may also inform the Court's prediction.  *Id*.

---

[9]  This estimate includes the repair and/or replacement of the carpet and tile floor.

3.     Applicable decisions of the Superior Court are also to be accorded significant weight. *Id.*  In other words, although state intermediate appellate court decisions are not binding, such decisions are "not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *West v. American Telephone & Telegraph Co.*, 311 U.S. 223, 237 (1940);  *see also Commissioner v. Estate of Bosch*, 387 U.S. 456, 465 (1967); *Northern Ins. Co. of New York v. Aardvark Associates, Inc.*, 942 F.2d 189, 193 (3d Cir. 1991).

4.     Pennsylvania law governs the interpretation of the Policy, since the policy was made and delivered in Pennsylvania. *J.C. Penney Life Insurance Co. v. Pilosi*, 393 F.3d 356, 360 (3d Cir. 2004).

5.     The task of interpreting an insurance policy is a function of the court.  The goal of that task is to ascertain the intent of the parties as manifested in the language of the written instrument. *Standard Venetian Blind Co. v. American Empire Insurance Company*, 469 A.2d 563, 566 (1983).

6.     An ambiguity exists when a questionable term or language in an insurance policy, viewed in the context of the entire policy, is reasonably susceptible of different constructions and capable of being understood in more than one sense. *Pilosi*, 393 F.3d at 363.

7.     A court should interpret the policy to avoid ambiguities and give effect to all of its provisions, and refrain from torturing the language of a policy to create ambiguities where none exist. *Pilosi*, 393 F.3d at 363.

8.     Where a policy is ambiguous, it will be construed in favor of the insured.  Where, however, the language of an insurance contract is clear and unambiguous, a court is required to enforce that language. *Pilosi*, 393 F.3d at 363.

9.     In her Report and Recommendation, which the Court adopted as its own opinion, Judge Hay found that the Additional Coverage Extension, coupled with a related provision, rendered the Policy ambiguous as to whether the incident which occurred here was covered by the Policy. *See* Document No. 41.  Defendant urges the Court to reconsider that determination. Defendant's Post-Trial Brief at 7.  The Court has again reviewed the Report and Recommendation

11

and declines to disturb that ruling.  As the Report and Recommendation states, "the policy in this particular case contains yet another provision which seems to distinguish between fuel and pollutants where heating oil is involved since that other provision would provide coverage for damage or loss as a result of leaking liquids – arguably heating oil – from heating equipment." Document No. 41 at 9-10.[10]

10.     Construing the policy in favor of Plaintiff, the Court finds and rules that the Policy provides coverage for the loss which occurred here.  Therefore, Defendant must reimburse Plaintiff for the loss which he sustained at his business.

11.     Assuming, *arguendo*, that the policy is *not* ambiguous, and that the loss at issue here is *not* covered by the express terms of the policy, the Court finds and rules that Defendant must provide coverage to Plaintiff under the reasonable expectations doctrine.

12.     The general rule in Pennsylvania is that "[w]here ... the language of the contract is clear and unambiguous, a court is required to give effect to that language." *Standard Venetian Blind Co., supra*, 469 A.2d at 566.  Our court of appeals has observed that "this rule based in part on the supposition that in most cases the language of an insurance policy will provide the best indication of the content of the parties' reasonable expectations." *Bensalem Twp. v. International Surplus Lines Ins. Co.*, 38 F.3d 1303, 1309 (3d Cir. 1994).

13.     However, as the *International Surplus* court explained, "in certain situations the insured's reasonable expectations will be allowed to defeat the express language of an insurance policy." *Id*.[11]  Exactly which situations warrant application of the reasonable expectations doctrine is less than crystal clear under Pennsylvania law.  Indeed, after reviewing the relevant Pennsylvania Supreme Court cases, our court of appeals was "unable to draw any categorical distinction between the types of cases in which Pennsylvania courts will allow the reasonable

---

[10]  In the absence of these additional provisions, the "pollution exclusion" would not be ambiguous.  *See* Report and Recommendation at 7-8.

[11]  A recurring theme in Pennsylvania Supreme Court cases is that "the insurance industry and its recondite practices are responsible for deviations from the general rule." *International Surplus*, 38 F.3d at 1312.

expectations of the insured to defeat the unambiguous language of an insurance policy and those in which the courts will follow the general rule of adhering to the precise terms of the policy." *Id.* at 1312.

14.    Nevertheless, the *International Surplus* court was able to distill the essence of the reasonable expectations doctrine:

> One theme that emerges from all the cases ... is that courts are to be chary about allowing insurance companies to abuse their position vis-a-vis their customers. Thus we are confident that where the insurer *or its agent* creates in the insured a reasonable expectation of coverage that is not supported by the terms of the policy that expectation will prevail over the language of the policy.

*Id.* (emphasis added); *see also Dibble v. Security of American Life Ins. Co.*, 590 A.2d 352, 354 (Pa. Super. Ct. 1991) ("[T]he proper focus regarding issues of coverage under insurance contracts is the reasonable expectation of the insured. Courts must examine the totality of the insurance transaction involved to ascertain the reasonable expectation of the insured.") (*citations omitted*); *Harford Mut. Ins. Co. v. Moorhead*, 578 A.2d 492, 495 (Pa. Super. Ct. 1990), *appeal denied*, 590 A.2d 757 (1991) ("[O]verly-subtle or technical interpretations may not be used to defeat reasonable expectations of insureds.").

15.    The Court has found no Pennsylvania Supreme Court or Superior Court decisions which directly address the facts of this case.  However, the relevant case law seems to indicate that the Pennsylvania Supreme Court, were it to decide this case, would find that the reasonable expectations doctrine defeats the express terms of the Policy and provides coverage for the loss at issue.  It is perfectly clear that Weaver, acting as an agent of Defendant, "create[d] in the insured a reasonable expectation of coverage." *International Surplus*, 38 F.3d at 1312.  Plaintiff always viewed Weaver as an agent, employee, or authorized representative of Defendant.  Regardless of what label is affixed to Weaver, Plaintiff thought at all relevant times that he was dealing with someone who was affiliated with Defendant and had the authority to definitively say what was and was not covered by the Policy.  His perception of Weaver's business relationship with Defendant was entirely reasonable given the considerable evidence of an agency relationship between Defendant and Weaver.  Plaintiff also took deliberate and reasonable steps to ensure that his building was properly insured during construction and thereafter.  Weaver's representations to

13

Plaintiff concerning the scope of coverage, and particularly those representations regarding oil furnaces, clearly establish that an agent of Defendant created a reasonable expectation of coverage.

16.   The Court is cognizant of the fact that Weaver's representations concerning coverage were made *after* the Plaintiff purchased the Policy.  Thus, unlike *Tonkovic v. State Farm Mut. Auto. Ins. Co.*, 521 A.2d 920 (Pa. 1987), where the Pennsylvania Supreme Court applied the reasonable expectations doctrine, this is not a case "where one *applies* for a *specific type* of coverage and the insurer unilaterally limits that coverage, resulting in a policy quite different from what the insured requested ..." *Tonkovic*, 521 A.2d at 925 (*emphasis added*).  In the view of the Court this distinction is not sufficient to render the reasonable expectations doctrine inapplicable.

17.   The Second Amended Complaint alleges that Defendant acted in bad faith, in violation of 42 Pa.C.S. § 8371, in a variety of ways.  The gravamen of Plaintiff's bad faith claim is that Defendant "acted with knowledge and reckless disregard of the lack of a reasonable basis for denying the claim."  Second Amended Complaint at ¶ 33.  The Second Amended Complaint also alleges that the following actions amount to bad faith:

- Defendant failed "to perform its fiduciary duties under the Policy in investigating the claim and providing benefits to the Plaintiff";

- Defendant "failed to act in good faith and fairly deal with the Plaintiff in handling his claim";

- Defendant "engaged in a business practice which constituted unfair settlement or compromise practices in that it misrepresented pertinent facts of the policies and contract to the Plaintiff";

- Defendant "failed to adopt and implement reasonable standard for the prompt investigation of claims, in this case the claims submitted by the Plaintiff";

- Defendant refused "to pay the claim without conducting a reasonable investigation based upon all available information";

- Defendant failed "to affirm or deny coverage within a reasonable time after proof of loss statements had been communicated to the company";

- Defendant did not attempt in good faith "to effectuate a prompt, fair and equitable

settlement of this claim, where the company's liability under the policy is reasonably clear";

- Defendant "compell[ed] the Plaintiff to institute litigation to recover amounts due under an insurance policy, by offering substantially less than the amount due and ultimately recoverable in such an action";

- Defendant "exclud[ed] benefits or coverage under their insurance policy for losses incurred by the Plaintiff";

- Defendant "denied the Plaintiff's claim due to the size of the claim and not the pollution exclusion";

- Defendant "has delayed a reasonable investigation of the Plaintiff's claim";

- Defendant "has done inadequate legal research to determine whether or not the claim is covered by the policy";

- Defendant "failed to make a reasonable offer of settlement for the damages sustained by the Plaintiff";

- Defendant "fraudulently induced the Plaintiff to purchase an insurance policy representing that the type of damages which he sustained were covered by the policy."

Second Amended Complaint at ¶¶ 34-40.

18.    Pennsylvania's bad faith statute provides:

In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
(2) Award punitive damages against the insurer.
(3) Assess court costs and attorney fees against the insurer.

42 Pa.C.S. § 8371.

19.    The term "bad faith" is not defined in the Pennsylvania statute.  42 Pa.C.S. § 8371.

Pennsylvania courts have interpreted it to mean any frivolous or unfounded refusal to pay proceeds

of a policy.  *Terletsky v. Prudential Property and Casualty Insurance Company*, 649 A.2d 680,

688 (1994), *appeal denied*, 659 A.2d 560 (1995); *see also Pilosi*, 393 F.3d at 367.

20.     In order to state a cause of action under 42 Pa.C.S. § 8371, plaintiff must prove by clear and convincing evidence that Motorists' did not have a reasonable basis for denying coverage, and that it knew of or recklessly disregarded its lack of reasonable basis. *Klinger v. State Farm Mutual Auto Insurance Company*, 115 F.3d 230, 233 (3d Cir. 1997); *see also Pilosi*, 393 F.3d at 367.

21.     The clear and convincing evidence standard on a claim of bad faith requires that the plaintiff show that the evidence is so clear, direct, weighty and convincing as to enable a clear conviction, without hesitation, about whether or not the defendants acted in bad faith. *Pilosi*, 393 F.3d at 367; *see also Willow Inn, Inc. v. Public Service Mut. Ins. Co.*, 399 F.3d 224, 229 (3d Cir. 2005).

22.     The Court finds and rules that Defendant is not liable to plaintiff for bad faith insurance practices.  The facts of this case, as found by the Court, are not sufficient to demonstrate by clear and convincing evidence that Defendant acted in bad faith at any point in its dealings with Plaintiff.  This conclusion applies to the actions taken by Weaver as an agent of Defendant, and to the various actions taken by Weber, Evans, Wetzel, Palamara, Taylor, and any other employee or agent of Defendant who was involved with the decision to deny Plaintiff's claim.

23.     First, Defendant did not act in bad faith when it denied coverage because the pollution exclusion can reasonably be interpreted to exclude coverage for the incident.  Although the Court does not agree with such an interpretation in light of other provisions in the Policy, the position taken by Defendant was not frivolous or completely unreasonable.

24.     Defendant also did not act in bad faith in its investigation of the claim.  Defendant received notice of the loss on April 6, 2001, and promptly commenced an investigation of the loss.  By April 26, 2001, Defendant had advised Plaintiff's public adjuster of the applicability of the pollution exclusion.  Prior to doing so, Defendant's branch office personnel had visited and inspected the building, consulted with the home office claims consultant and conducted research into how other insurance companies had construed similar losses.  Additionally, Defendant continued to consider information submitted by the insured's attorney, and obtained its own

16

estimate of the cost of repairing the building.  Defendant also "Boarded" the claim on three occasions to review information gathered in its own investigation as well as the information provided by the insured.

25.     There is no evidence that Motorists breached a known duty to its insured through some motive of self-interest or ill will, necessary to establish bad faith.  *Terletsky v. Prudential Property & Casualty Insurance Company*, 649 A.2d 680, 688 (1994)*, appeal denied*, 659 A.2d 560 (1995).  It is not bad faith to investigate and litigate legitimate issues of coverage.  *Pilosi*, 393 F.3d at 368.

26.     Defendant did not act in bad faith by misrepresenting the terms of the policy. There is no evidence that the allegedly erroneous representations made by Weaver regarding coverage were made in bad faith.  Weaver may have been somewhat negligent or careless during his conversations with Plaintiff regarding coverage.  However, his testimony and demeanor at trial were reflective of someone who may have made an honest mistake as to the scope of coverage.

27.     Defendant did not act in bad faith by failing to honor Weaver's representations regarding the scope of coverage.  There is no evidence that Defendant's "in house" employees knew of Weaver's misrepresentations prior to the loss.  Additionally, the issue of whether Weaver's statements could have binding effect on Defendant is not crystal clear under Pennsylvania law.  Under these circumstances the failure to provide coverage based upon Weaver's representations does not amount to bad faith.

28.     The fact that Weaver made statements that were inconsistent with the coverage position taken by Defendant is not sufficient to demonstrate that Defendant acted in bad faith in denying coverage.  Motorists had a reasonable basis for denying coverage based on 1) the terms of the policy and 2) a significant issue as to whether Weaver's representations could be binding upon Defendant, which defeats a claim of bad faith.  *Pilosi*, 393 F.3d at 368.

29.     Defendant did not act in bad faith in offering to settle the claim for $19,383.90.  It is common practice in the insurance industry to attempt to resolve disputed claims by compromise rather than subjecting each and every claim to litigation.  Defendant had a reasonable basis for disputing the claim based on the absolute pollution exclusion.  Accordingly, its offer of

compromise was neither evidence of bad faith nor an acknowledgment of coverage.

30.     As to the remaining allegations of bad faith, suffice it to say that the other actions taken by Defendant were generally reasonable and did not reflect bad faith.

31.     Plaintiff is entitled to damages in the following amounts for the claim of breach of contract:

> a.     $46,210.00 for general repairs to the interior of the structure;
>
> b.     $17,568.00 for removal, storage and return of the building's contents; and
>
> c.     $930.00 for the damaged clothing.

32.     Plaintiff's total damages amount to $64,708.00.

33.     In *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 495-96 (1941), the Supreme Court found that rules for determining the measure of damages are "matters of substance" for *Erie* purposes. *See id.* at 496.  In *Yohannon v. Keene Corp.*, 924 F.2d 1255, 1267 (3d Cir. 1991), the Third Circuit found that rules concerning prejudgment interest were "matters of substance" for *Erie* purposes.  Thus, under *Erie*, the court is to look to Pennsylvania law, as opposed to federal law, to determine prejudgment interest.

34.     Under Pennsylvania law, prejudgment and postjudgment interest are calculated at six percent per annum.  *See* 41 Pa.C.S.A. § 202; 42 Pa.C.S.A. § 8101.  In insurance cases involving prejudgment interest, when the insurer denies liability in toto, prejudgment interest is to be assessed from the date of loss.  *See Compagnie des Bauxites v. Ins. Co. of North America*, 794 F.2d 871, 879 (3d Cir.1986) ("Courts have held that under Pennsylvania law when the insurer denies any liability, the insured is entitled to interest from the date the loss occurred.") (citations omitted).

35.     As mentioned earlier, the loss occurred on April 3, 2001.  Therefore, the Court will award Plaintiff prejudgment interest on $64,708.00 at the rate of 6% per annum, to be calculated as of April 3, 2001.  The Court will also award Plaintiff postjudgment interest on $64,708.00 at the rate of 6% per annum, to be calculated as of the date of this Memorandum Opinion and the accompanying Judgment.

## **Conclusions**

For the foregoing reasons, judgment will be entered in favor of Plaintiff on the claim for breach of contract in the amount of $64,708.00, plus prejudgment interest, postjudgment interest and costs.  However, the Court will enter judgment in favor of Defendant on the claim for bad faith.  An appropriate Order follows.

McVerry, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **LAWRENCE HARTMAN, JR.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| **v.** ) | |
| ) | **2:02cv1038** |
| **MOTORISTS MUTUAL INSURANCE** ) | |
| **COMPANY,** ) | |
| ) | |
| **Defendant.** ) | |

## ORDER OF COURT

AND NOW, this 19th day of January, 2006, in accordance with the foregoing Memorandum Opinion, Findings of Fact and Conclusions of Law it is hereby **ORDERED, ADJUDGED and DECREED** that judgment in favor of plaintiff Lawrence Hartman, Jr. is hereby entered on his claim for breach of contract in the amount of $64,708.00 plus prejudgment and postjudgment interest at the rate of 6% per annum, plus costs.

Judgment in favor of defendant Motorists' Mutual Insurance Company is hereby entered on Plaintiff's claim for bad faith insurance practices.

BY THE COURT:

s/ Terrence F. McVerry
United States District Court Judge

cc:   Robert P. Ging, Jr., Esquire
       Email: ging@qcol.net

       William James Rogers, Esquire
       Email: wjr@trc-law.com